CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
OCT 0 6 2005
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action No. 7:05CR00072 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JAMES CARMICHAEL SMITH, | ) | |
| | ) | By: Hon. James C. Turk |
| Defendant. | ) | Senior United States District Judge |

This matter is before the court on defendant James Carmichael Smith's August 17, 2005 motion to suppress at trial all evidence obtained from, and statements made by Smith on or about July 14, 2005 as a result of a stop and frisk, seizure and arrest. In this case, Smith has been indicted for unlawful possession of a firearm after being a convicted felon. Smith claims Fourth Amendment violations that police officers lacked reasonable suspicion to stop or detain him, and therefore also lacked a lawful basis to search and arrest him. This matter was fully briefed by the parties and a hearing was held on September 23, 2005. After reviewing the evidence, briefs and arguments by the parties, the court finds that Smith's Fourth Amendment rights were not violated. Therefore, the court denies Smith's motion to suppress.

### I.

The facts currently in the record are as follows. On July 14, 2005, the Roanoke City Police Department received a "911" emergency call from a complainant who identified herself to the police as Amanda Clark and who stated that two men had just left her house after one had brandished a firearm; she provided her address to police. Specifically, Clark stated that Bobby Ray Legans, whom she stated was the father of her baby, came to her house and asked her to give

Legans his ID; she told Legans she did not have his ID and in response Legans threatened to "shoot-up" her house. Clark stated that Legans had "just" left her house with his black male friend whom she knew as "Tiger."[1] The 911 dispatcher asked Clark whether she saw "a gun or anything" and she stated that she saw a "brown and black little handgun" "hanging out of [Legans's] pants" and she described specifically by street names the direction in which the two men walked and where she believed they were headed and why. Clark also described Legans as a 5'9" tall black man who wore a blue shirt and gray jogging britches. Clark further stated that the two men left her house "maybe five to seven minutes" past, and that she was willing to speak with the police at her house. Towards the end of the call, Clark reiterated her concern that Legans said he would shoot-up her house and that her children were in the house with her.

Police officers R.B. Lucas and C.E. Curry responded to the emergency call together in the same patrol car. Lucas observed two black men who matched Clark's description and who were walking down a street in the vicinity of her house which Clark described. Lucas stopped the car and approached Legans. Lucas questioned Legans, Legans affirmatively identified himself, and Lucas then frisked Legans for weapons. After Lucas questioned and frisked Legans and found no weapons on Legans, Curry asked Smith for identification and he volunteered his wallet.[2] Smith

---

[1] Smith is also known as "Tiger."

[2] The defendant disputes whether it is clear from the record that Curry frisked Smith after Lucas frisked Legans and found no weapons. The officers testified that Lucas frisked Legans first, and upon finding no weapons, Lucas then asked Curry to frisk Smith for weapons. The officers also testified that they suspected Smith might have had a gun on his person based on: Clark's descriptions of the two men and the direction in which they walked; the two men were spotted in the vicinity of Clark's house; Clark's statements that Legans brandished a gun at her house and threatened to shoot-up her house; Lucas affirmatively identified Legans; and Lucas found no weapons on Legans.

Based on the parties' pleadings and testimonial evidence concerning Smith's motion to

2

testified that he chose to remain on the scene with Legans and volunteered his wallet to Curry because of his sense of "duty" and to show respect for the police. Smith also testified that Curry was polite to him. As Curry questioned Smith, he began to rock on his feet and asked to leave the scene to find a bathroom; Curry told him he could not leave to do so. Curry became suspicious of Smith's behavior and frisked Smith for weapons; she felt a handle of a firearm and recovered a gun from Smith's waistband which matched Clark's description.

At the hearing on Smith's motion to suppress, the officers testified that the area in which they spotted the two men was a high-crime area. Lucas also testified that after he found no weapons on Legans he asked Curry to frisk Smith for weapons. Curry testified that she frisked Smith after she became suspicious of Smith's "nervous" behavior and that she frisked Smith for weapons out of concern for the officers' safety. Additionally, both officers testified that under the circumstances they had a reasonable suspicion that Smith might be armed with the gun brandished by Legans which Clark described during her 911 call to police because 1) Smith acted unusually nervous and suddenly asked to use the bathroom; 2) the two men matched Clark's descriptions and were in the vicinity of Clark's house within minutes of her emergency call; 3) the two were in high-crime area; and 4) no gun was found on Legans. Both officers testified that they are experienced officers.

After Curry recovered the gun on Smith and she attempted to secure the gun in the police car, Smith then immediately fled the scene on foot and was taken into custody after an extensive

---

dismiss, coupled with the evidence thus far in the record, the court determines that Curry frisked Smith after Lucas frisked Legans and found no weapons on Legans. Nevertheless, the court's decision and reasoning in this opinion is not hinged on the sole fact, or determination, that Legans was frisked prior to Smith.

3

search of the area, which involved several officers and patrol cars. After Smith was apprehended and taken into custody, Curry identified Smith as the same man she recovered the gun from and who fled the scene. Smith's criminal history revealed that he was a convicted felon who had seven previous felonies between 1999-2005. Smith was indicted for unlawful possession of a firearm after being a convicted felon.

Smith claims that his Fourth Amendment rights were violated by the officers and therefore any evidence obtained from him, including any statements he made on or about July 14, 2005 should be suppressed. In support of his claims, Smith argues that because Clark did not provide during the 911 call a description of Smith or state that the "unknown" man with Legans brandished a gun or threatened to shoot her house as Legans did; the officers therefore lacked reasonable suspicion to conduct an investigatory stop of Smith because they had no reason to suspect Smith was engaged in criminal activity, that he was the "unknown" man with Legans who had been at Clark's house, or that he was both armed and presently dangerous.[3] Smith denies that the officers had any basis to detain him, or that his request to find a bathroom was suspicious, odd behavior under the circumstances. Smith argues that the officers stopped him and then frisked him merely because he was Legans's companion at the time of the stop and because he was in close proximity to Legans. Smith argues further that because the officers had no lawful basis to detain him, the frisk was unconstitutional as well.

The government denies Smith's claims. In response, the government argues that under the totality of the circumstances, the officers had reasonable suspicion based on objective and

---

[3]Smith cites myriad cases in support of his claims throughout his pleadings, but predominantly relies on the facts and decisions in Terry v. Ohio, 392 U.S. 1 (1968); Ybarra v. Illinois, 444 U.S. 85 (1979); and Florida v. J.L., 529 U.S. 266 (2000).

4

articulable facts to stop and frisk both Legans and Smith, and to recover the gun found on Smith.[4] The government argues that Smith and Legans matched Clark's descriptions, they were spotted in the vicinity of Clark's house within minutes of her 911 call, and within minutes of brandishing a gun in front of Clark's house; therefore it was reasonable for the officers to stop both men and to suspect that they were engaged in the criminal activity Clark described. The government further argues that upon Legans's affirmative identification, the officers had reason to believe that the suspects might be armed and dangerous; and after Lucas found no weapons on Legans it was reasonable for the officers to believe that there was a possibility that Smith might be concealing the gun that Legans had brandished at Clark's house. The government contends that Curry's frisk of Smith was therefore lawful because the officers were justified in patting down Smith for their own protection and for the protection of others, and were justified in recovering the gun Curry found on Smith. Thus, the government argues that Smith's motion to suppress should be denied and the evidence obtained as a result of the stop and frisk is admissible.

## II.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. CONST. Amend. IV. A police officer may stop and briefly detain a person for investigative purposes provided the officer has a reasonable suspicion, based on articulable facts and in light of the officer's experience, that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). The amount of reasonable suspicion necessary for an officer to conduct a Terry frisk of a

---

[4] The government cites myriad cases throughout its pleadings in support of its position, but predominantly relies on the facts and decisions in U.S. v. Smith, 396 F.3d 579 (4th Cir. 2005); U.S. v. Poms, 484 F.2d 919 (4th Cir. 1973); Terry v. Ohio, 392 U.S. 1 (1968); and El-Amin v. Commonwealth, 269 Va. 15 (2005).

5

person who may be innocent is considerably less than the amount of proof required for probable cause to conduct a full search. U.S. v. Sokolow, 490 U.S. 1, 7 (1989) (stating that reasonable suspicion cannot be reduced to a "neat set of legal rules"); Illinois v. Gates, 462 U.S. 213 (1983). An officer may make reasonable inquiries designed to confirm or dispel suspicions, Terry, 392 U.S. at 30, and an officer is entitled to make "common-sense conclusions about human behavior" which are based on "the totality of the circumstances—the whole picture" of events, U.S. v. Cortez, 449 U.S. 411, 417-18 (1981). If an officer remains suspicious of a person's activity after investigating the person's behavior at close range, and if an officer is justified in believing that the person may be armed and dangerous, an officer may conduct a pat-down or frisk search "to determine whether the person is in fact carrying a weapon." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing, Terry, 392 U.S. at 24). Thus, all that is required to justify a Terry search or seizure is "some minimal level of objective justification." INS v. Delgado, 466 U.S. 210, 217 (1984).

Furthermore, an officer may seize weapons detected during a frisk provided that the search did not exceed the scope necessary to protect the safety of the officer and nearby persons. See Dickerson, 508 U.S. at 375-76. An officer conducting a valid frisk may seize an item if it is objectively reasonable under the circumstances for an officer to believe that the item could likely be a weapon. See e.g., U.S. v. Swann, 149 F.3d 271, 277 (4th Cir. 1998). Therefore, any weapon seized as a result of a valid frisk is admissible evidence against the person from whom it was taken. Terry, 392 U.S. at 30-31.

### III.

The evidence obtained from, and statements made by Smith on July 14, 2005 are

6

admissible. The officers' stop and frisk of Smith were based on reasonable suspicion under the totality of the circumstances. Consequently, the seizure of the gun found on Smith was lawful, and therefore Smith's arrest was also proper and reasonable.

The officers had reasonable suspicion to stop and frisk Smith. The officers responded to Clark's emergency 911 call. See Terry, 392 U.S. at 30-31. Clark, who was not an anonymous tipster, identified herself and stated that she was calling because the father of her child, Legans, had brandished a gun at her house and threatened to shoot-up her house. See id. Clark identified Legans, provided a detailed description of what Legans was wearing, and described the direction in which the two men walked on foot. Clark identified Legans as walking with a friend whom she said she knew, and whom she identified as "Tiger." Smith is also known as "Tiger." Clark stated that "Tiger," or Smith, was with Legans when he brandished a gun in front of her house and threatened to shoot-up her house—clearly violent behavior. Moreover, Clark stated that the two men had left her house within the past 5-7 minutes, she expressed her willingness to speak further with the police concerning this incident, and she expressed concern regarding Legans threat of violent behavior coupled with his possession of a gun while her children were in the house with her. Thereafter, the officers spotted Legans and Smith who they believed matched the description given to them from the 911 dispatcher—Clark's description. See Sokolow, 490 U.S. at 7. The officers also spotted the two men in the vicinity of Clark's house, as she described, within minutes of Clark's emergency call. See id. Based on the information Clark provided, the officers had a reasonable suspicion to conduct an investigatory stop of the two men to inquire whether they were in fact the men Clark complained of during her emergency call. See Terry, 392 U.S. at 30-31. Legans affirmatively identified himself, after which Lucas frisked him for

7

weapons but did not find any on his person. Both officers testified concerning Smith's strange and suspicious behavior following the stop of Legans and Smith—his nervous jumping and immediate request to use the bathroom after showing the officer his wallet and identification—and his subsequent attempt to flee from police. See Cortez, 449 U.S. at 417-18.

The officers had a reasonable suspicion based on articulable facts that Smith was connected with the suspected criminal activity afoot. See id.; Delgado, 466 U.S. at 217. Further, because officers had already determined that Legans was the suspect whom Clark described during the 911 call as the man who brandished a gun and threatened to shoot-up her house and who was accompanied by his friend a few minutes earlier, officers determined it was possible that Smith was the friend who accompanied Legans at Clark's just minutes prior to the investigatory stop. Additionally, because officer Lucas's frisk of Legans determined that Legans did not possess a gun, officer Curry was authorized to frisk Smith based on her belief that Smith could be armed with the gun Clark described that Legans brandished. See Dickerson, 508 U.S. at 373. Therefore, it was reasonable for the officers to suspect that Smith might be armed and dangerous. Thus, it was also reasonable under the totality of the circumstances for Curry to frisk Smith for weapons out of concern for the officers' safety. See id. Upon frisking Smith, Curry felt an object that based on her experience seemed to be the handle of a firearm; she then recovered and seized a gun from his waistband. See Swann, 149 F.3d at 277. The gun Curry recovered from Smith's waistband matched Clark's description of the gun she saw Legans brandish. As a result, the seizure of Smith's gun was lawful because a reasonable officer in Curry's position under the circumstances could have justifiably believed the item she felt was the handle of a firearm. See Terry, 392 U.S. at 30-31.

8

Based on the evidence in the record and under the circumstances in this case, the court finds that Curry reasonably believed that Smith could have been concealing a weapon; it was reasonable for her to frisk Smith for the safety of the officers; Curry lawfully recovered and seized the gun from Smith; and therefore, the evidence obtained on July 14, 2005 is admissible against Smith. See id.

## IV.

For the foregoing reasons, the court denies Smith's motion to suppress.

**ENTER**: This 6th day of October, 2005.

*James C. Turk*
SENIOR UNITED STATES DISTRICT JUDGE